## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| ELLEN HANCOCK, as Trustee of the Hillman Mather Adams Norberg Trust, | ) ) ) ) | |
| Appellant, | ) ) | |
| v. | ) ) | No. 2:22-cv-00099-JDL |
| BLAIR HOUSE ASSOCIATES LIMITED PARTNERSHIP, and GENERAL HOLDINGS, INC., | ) ) ) ) | |
| Appellees. | ) ) | |
| MARY F. WOLFSON, as Trustee of the Hillman Mather Adams Norberg Trust, | ) ) ) ) | |
| Appellant, | ) ) | |
| v. | ) ) | No. 2:22-cv-00194-JDL |
| BLAIR HOUSE ASSOCIATES LIMITED PARTNERSHIP, | ) ) ) | |
| Appellee. | ) | |

## ORDER ON BANKRUPTCY APPEALS

This order addresses two appeals that relate to an involuntary bankruptcy petition which was originally filed by Ellen Hancock, as Trustee for the Hillman Mather Adams Norberg Trust ("Hancock"), against Blair House Associates Limited Partnership ("Blair House") pursuant to 11 U.S.C.A. § 303 (West 2022). In June 2021, Chief Judge Peter G. Cary of the United States Bankruptcy Court for the District of Maine (the "Bankruptcy Court") dismissed the involuntary petition (Bankruptcy Case, D.E. 22), and, in August 2021, it ordered Hancock, in her capacity as Trustee,

to pay attorney fees and punitive damages (*Hancock*, App. at 534).[1]  In the first appeal, which I will refer to as the *Hancock* appeal (Civil No. 2:22-cv-00099-JDL), Hancock appeals (*Hancock*, ECF No. 1) from three orders of the Bankruptcy Court: (1) the Order on Requesting Attorneys' Fees (*Hancock*, App. at 534) (2) the Further Order on Request for Award of Attorney's Fees and Punitive Damages (*Hancock*, App. at 609-620), and (3) the Order Denying Motion to Reconsider, Alter, or Amend Judgment (*Hancock*, App. at 648-651).  The appellees, Blair House and General Holdings, Inc., elected to have the District Court hear the appeal and on April 14, 2022, the Bankruptcy Appellate Panel for the First Circuit issued an Order transferring the appeal to the District Court, which has jurisdiction over this matter pursuant to 28 U.S.C.A. § 158 (West 2022).  After the appeal was filed, Blair House notified the Bankruptcy Court that Ellen Hancock had died.  Hancock was replaced as Trustee of the Trust by Mary F. Wolfson, who was substituted as the appellant in the *Hancock* appeal (*Hancock*, ECF No. 5).[2]

On April 29, 2022, before the Bankruptcy Court had been notified of Hancock's death, it ordered that a writ of execution issue against Hancock in her capacity as

---

[1]  This order will primarily discuss filings made under three different docket numbers: filings in the Bankruptcy Court case *In re Blair House Associates Ltd. Partnership*, Bankruptcy No. 21-bk-20110; filings in the District Court appeal *Ellen Hancock, as Trustee of the Hillman Mather Adams Norberg Trust v. Blair House Associates Ltd. Partnership*, Civil No. 2:22-cv-00099-JDL; and filings in the District Court appeal *Mary F. Wolfson, as Trustee of the Hillman Mather Adams Norberg Trust v. Blair House Associates Ltd. Partnership*, Civil No. 2:22-cv-00194-JDL.  To keep matters simple, these cases are referred to as the "Bankruptcy Case," "*Hancock*," and "*Wolfson*," respectively.  Additionally, documents that appear in the *Hancock* and *Wolfson* Bankruptcy Appendices are cited as "App. ----." Other documents are cited by reference to their CM/ECF numbers.

[2]  Because Wolfson has been substituted as the appellant in the *Hancock* appeal, I will refer to the appellant as Wolfson with respect to events that occurred after the date of substitution.  The relevant party for all events that occurred prior to the substitution, including historical events related to the filing of the involuntary petition, will be referred to as Hancock.  The appellee in both the *Hancock* and *Wolfson* appeals will be referred to as Blair House.

Trustee in the sum of $148,000—the amount that had previously been awarded in fees and damages (*Wolfson*, App. at 16).  On June 22, 2022, the Bankruptcy Court ordered that Wolfson be substituted for Hancock and that a writ of execution be issued against Wolfson in her capacity as Trustee (*Wolfson*, App. at 59).  In the second appeal, which I will refer to as the *Wolfson* appeal (Civil No. 2:22-cv-00194-JDL), Wolfson appeals the latter order insofar as it orders a writ of execution to issue against her (*Wolfson*, ECF No. 1).  Wolfson elected to have the District Court hear the appeal pursuant to 28 U.S.C.A. § 158.

For the reasons given below, with respect to the first appeal, I vacate the judgment and remand for further proceedings.  With respect to the second appeal, I dismiss the appeal as moot.

## I.  BACKGROUND

### A.  The Partnership Agreement

Blair House is a Maine limited partnership originally formed on May 8, 1990. On November 1, 1993, a Second Amended and Restated Limited Partnership Agreement ("Partnership Agreement") was entered into by Pamela W. Gleichman and Gleichman & Company, Inc., as the general partners, and Columbia Housing Partners Corporate Tax Credit Limited Partnership, as the limited partner.  The Partnership Agreement "restate[d], amend[ed,] and supersede[d] the Original Agreement," the terms of which are not in the record.  *Hancock*, App. at 90.

The Partnership Agreement provides that general partners have, subject to some limitations, "all authority, rights and powers generally conferred by law, including the authority, rights, and powers of a general partner in a partnership

without limited partners, and shall have all authority, rights[,] and powers which they deem necessary or appropriate to effect the purposes of the Partnership," including "[t]o bring or defend, pay, collect, compromise, arbitrate, resort to legal action or otherwise adjust claims or demands of or against the Partnership." *Hancock*, App. at 109.  The general partners are also "subject to all of the restrictions and limitations of a partner in a partnership without limited partners."  *Hancock*, App. at 110.  Additionally, general partners need the consent of a majority of parties holding a limited partnership interest to "[d]issolve and wind up the Partnership," "[r]emove a General Partner," and "[a]dmit a General Partner."  *Hancock*, App. at 110.

With respect to changes among general partners, the Partnership Agreement provides that upon the occurrence of an Event of Withdrawal of a general partner, that general partner "shall immediately cease to be a General Partner and her or its interest as [a] General Partner shall terminate." *Hancock*, App. at 124.  Furthermore, "[s]ubject to any required [Rural Development Office] approval, no General Partner may resign or withdraw from the Partnership without providing a successor General Partner satisfactory to any other General Partner(s), and without approval of each Limited Partner."  *Hancock*, App. at 123.  The Partnership Agreement further provides that "no Partner may withdraw from the Partnership . . . without the [c]onsent of the [Rural Development Office]." *Hancock*, App. at 129.

As to dissolution, the Partnership Agreement provides that "[t]he Partnership shall be dissolved upon . . . [a]n Event of Withdrawal with respect to a sole General Partner, unless continued . . . [or] [t]he Sale of the Project other than pursuant to a

contract of sale." *Hancock*, App. at 128.  However, "[i]n no event shall the Partnership terminate if such termination would result in a violation of any law, regulation[,] or regulatory agreement to which the Partnership is bound." *Hancock*, App. at 128.

Additionally, the Agreement provides that "[f]or as long as the Project continues to be a 'Rural Rental Housing Project[,]' all terms of this Agreement and all operations of the Partnership are subject to the regulations of [the Rural Development Office].  In all cases in which this Agreement conflicts with [such] regulations, [the] regulations shall take precedence." *Hancock*, App. at 128.  The General Partners also covenanted to act in accordance with the documents governing the rural rental housing project.

The Partnership Agreement also defines several terms that are relevant to these appeals.  "Event of Withdrawal" is defined as "the occurrence (unless waived in writing by all Partners)" of a number of events, including: "[t]he withdrawal or removal of any General Partner, or the sale, assignment, transfer[,] or encumbrance by a General Partner of all or a substantial . . . portion of her or its general partner interest in the Partnership"; "[t]he death or adjudication of incompetency of any individual General Partner"; "[t]he voluntary or involuntary dissolution of a General Partner which is not a natural person"; "[t]he sale, assignment, transfer or encumbrance of a 'controlling interest' . . . in a corporate General Partner"; and "[a]n Event of Bankruptcy with respect to any General Partner." *Hancock*, App. at 94.  Additionally, "Sale" is defined in the Partnership Agreement as "the sale, exchange, condemnation[,] or similar eminent domain taking, casualty or other disposition of all or any portion of the Property which is not in the ordinary course of business . . .

provided, however, that 'Sale' shall not refer to any transaction to the extent gain or loss is not recognized, or is elected not to be recognized, under any applicable section of the [Tax] Code." *Hancock*, App. at 97.

## B.  Factual Background

In 2013, the Hillman Mather Adams Norberg Trust succeeded Columbia Housing Partners as the limited partner of Blair House.  Additionally, in February 2014, according to Blair House's appellee brief, Gleichman & Company, Inc. changed its name to General Holdings, Inc.  As described in more detail later, the parties dispute whether Pamela Gleichman, *see infra* n.17, and General Holdings remain as general partners of Blair House.

In 1994, Blair House obtained a loan from the predecessor[3] of the United States Department of Agriculture's Rural Development Office to build a multi-family, low-income housing unit in Huntingdon County, Pennsylvania ("the project").  The loan was in the amount of $2,705,000, and it was secured by a mortgage in favor of the United States Government.  As part of the terms of the mortgage agreement, Blair House agreed to build a housing unit and manage that housing unit "for the purpose of housing people eligible for occupancy as provided in Section 515 of Title V of the Housing Act of 1949 and [federal] regulations."  *Hancock*, App. at 301.  Blair House agreed to use the proceeds of the promissory note to build and maintain the housing unit.  The loan agreement between the United States Department of Agriculture and Blair House stated that Blair House and its partners would "comply with all

---

[3]  The predecessor agency was called the Farmers Home Administration and is referred to as such throughout the Partnership Agreement.

appropriate [Department of Agriculture] regulations." *Hancock*, App. at 310.  The loan documents also imposed a duty on Blair House to keep the property in good care and operational.  Additionally, a provision of the loan agreement provided that there could be no change in Blair House's general partners without the Rural Development Office's approval.

On May 11, 2020, an accidental fire seriously damaged the project.  After the fire, Philadelphia Indemnity Insurance Company, which held the insurance policy on the project, made multiple loss payments to Blair House.  By January 2021, the insurance company had paid a total of $9,881,551.90.[4]

On February 4, 2021, Blair House wrote to the Rural Development Office, asking for permission to prepay the amount it owed to the Government with the insurance proceeds and not to rebuild the project.  On March 24, 2021, the Rural Development Office refused, saying that such an approach was foreclosed by 7 C.F.R. § 3560.652 (West 2022) and that Blair House's loan agreement with the Department of Agriculture required it to rebuild the project.

## C.    Procedural History

### 1.    The Involuntary Petition Against Blair House

On May 5, 2021, Hancock, as Trustee of the Trust, filed an involuntary petition for Chapter 7 bankruptcy against Blair House pursuant to 11 U.S.C.A. § 303 (*Hancock*, App. at 4-8).  The petition alleged that Blair House was not paying its debts and that there was no bona fide dispute as to the amount or fact of Blair House's

---

[4] The insurance company noted that it had concerns that the project was not being rebuilt or repaired in a timely fashion and that no actions were being taken to mitigate the risk of further harm.  The project was later damaged again in another fire.

liability. Specifically, Hancock alleged that the value of her claims against Blair House "exceeds $16,750 and most likely exceeds $6,900,000." *Hancock*, App. at 8. These claims allegedly consisted of two things: (1) at least $17,262 in unpaid cash distributions owed by Blair House to Hancock arising from Blair House's operation and (2) likely more than $6,900,000 in liquidation distributions owed to Hancock because, Hancock contended, Blair House had dissolved, which would entitle Hancock, its limited partner, to liquidation distributions. As explained in Hancock's later filings, she believed that there were two events that caused the dissolution of Blair House: the fire that destroyed the project and the alleged withdrawal of General Holdings as a general partner of Blair House due to a change in control of General Holdings.

General Holdings, asserting that it was still a general partner of Blair House, answered the involuntary petition on June 1, 2021 (*Hancock*, App. at 18-23). General Holdings denied that Blair House had a liability to Hancock that exceeded $16,750 and that was not subject to a bona fide dispute. It further argued that Hancock could not seek unpaid cash distributions dating back more than a year, and that the unpaid cash distribution claims were already being litigated by Hancock in *Richard Olson, Trustee of the Promenade Trust v. Pamela Gleichman,* No. BCD-CV-19-21, a pending case in the Maine Superior Court. General Holdings also argued that neither the May 11, 2020, fire nor the change in control of General Holdings constituted a dissolution event that would have dissolved Blair House. With respect to the change-in-control argument, General Holdings stated, "Hancock has also known since 2014 that General Holdings had foreclosed the interest of the then[-]general partner and

assumed the role of general partner of Blair House, which she acquiesced to.  In this case, however, she apparently wants to assert that the partnership was dissolved because she did not consent to the change in control of the general partner." *Hancock*, App. at 20 n.1.  Finally, General Holdings alleged that Hancock had filed the action because of her frustration with the Rural Development Office's decision requiring the project to be rebuilt and that Hancock had filed the action within hours of a conference call with the Rural Development Office.

The Bankruptcy Court held a status conference on June 4, 2021 (Bankruptcy Case, D.E. 8; *Hancock*, App. at 31).  At the conference, Hancock provided more information about why she believed that Blair House had been dissolved by the fire and the change in control of General Holdings.  She further argued that General Holdings had no right to act on behalf of Blair House or defend against the involuntary petition because it was no longer a general partner.

The Bankruptcy Court ordered the parties to confer and determine (1) what facts were disputed, (2) whether any of those disputes could be resolved by stipulation, (3) whether briefing would be required, and (4) how much discovery would be required.  The parties were unable to reach agreement, and, after receiving proposed orders from both parties, the Bankruptcy Court ordered that no discovery would be necessary to determine whether the debts are subject to a bona fide dispute. The Bankruptcy Court also required both parties to file briefs by June 18, 2021.

On the day that the parties' briefs were due and contemporaneously with the filing of her brief, Hancock filed an amended involuntary petition that withdrew the unpaid cash distribution claim and instead focused entirely on the liquidation

distribution that she alleged was required because of the dissolution of Blair House (*Hancock*, App. at 59-65). In her brief (*Hancock*, App. at 66-84), Hancock asserted that the fire at the project constituted a dissolution event under both the limited partnership agreement and corresponding state law, 31 M.R.S.A. § 1391 (West 2022). She further asserted that the liability and amount due to her were not subject to a bona fide dispute—an objective standard—because the fire clearly met the definition of a "Sale" in the Partnership Agreement, which is a dissolution event. According to Hancock, because the fire constituted a dissolution event, the only legitimate business left for Blair House was to wind up its business and liquidate its assets. She also argued that there was no reason why the involvement of the Rural Development Office should affect the analysis.

In her brief to the Bankruptcy Court, Hancock did not press the argument that there was a dissolution event caused by a change in control of General Holdings that led to its withdrawal as a general partner. Nor did she develop any argument that General Holdings could not properly defend against the involuntary petition because it was not a general partner—instead, she only stated in a footnote that "[t]he Trust reserves its rights as to the lawful status of General Holdings, Inc. as General Partner of Blair House." *Hancock*, App. at 66 n.1. In a declaration attached to the brief, Hancock took conflicting stances on the issue of whether General Holdings was a general partner of Blair House. She asserted both that "[t]he General Partner of Blair [House] has been General Holdings, Inc. . . . at all relevant times," *Hancock*, App. at 155, and that "[t]he Trust disputes that General Holdings is the sole General Partner of Blair House because General Holdings experienced a change of control

constituting an event of withdrawal under the [Partnership] Agreement," *Hancock*, App. at 156.

In its brief filed the same day (*Hancock*, App. at 197-212), General Holdings asserted that a bona fide dispute was demonstrated by (1) the pendency of *Olson v. Gleichman*, the state court action relating to the unpaid cash distributions, (2) the ambiguous language of the Partnership Agreement relating to "Sale," (3) the language of the loan documents, and (4) the objection from the Rural Development Office to Blair House's proposal to prepay and abandon the project. With respect to the previously-alluded-to argument that there was an event of dissolution when there was a change in control of General Holdings, General Holdings argued that there was a bona fide dispute because (1) Hancock had always treated General Holdings as a general partner; (2) Hancock is judicially estopped from raising that argument because she had argued in the *Olson* action in the Superior Court that General Holdings was a general partner;[5] and (3) the Rural Development Office never consented to the withdrawal of General Holdings. As to the argument that the fire constituted an event of dissolution, General Holdings argued that (1) under the terms of the Partnership Agreement, the fire did not cause a dissolution; and (2) the mortgage loan documents prevented the dissolution of Blair House without the

---

[5] General Holdings included a copy of Hancock's Answer in the *Olson v. Gleichman* case, in which she also asserted counterclaims and crossclaims. In that document, Hancock asserted that "[t]here are two General Partners" for Blair House's ventures: "one partner is Pam Gleichman and the other is Cross Claim Defendant General Holdings, Inc. f/k/a Gleichman & Co. (hereinafter 'General Holdings')." *Hancock,* App. at 277. She further said, "Cross Claim Defendant General Holdings is liable . . . . General Holdings was a fiduciary since it was a general partner in each of the Pennsylvania Projects and in each of the Maine Projects and was entrusted with funds to pay annually in accordance with the partnership agreements." *Hancock,* App. at 282.

federal government's consent.  General Holdings' briefing also addressed the unpaid cash distribution claim, which Hancock withdrew on that same day.

The Bankruptcy Court held argument on the involuntary petition on June 22, 2021 (Bankruptcy Case, D.E. 21; *Hancock*, App. at 325).  At the argument, the Bankruptcy Court considered whether there was a bona fide dispute as to liability and the amount due.  It concluded that there was such a bona fide dispute—in other words, that there was a genuine issue of material fact bearing on liability or a contention as to the application of the law to undisputed facts.  The Bankruptcy Court addressed both of the alleged events of withdrawal raised by Hancock.

First, the Bankruptcy Court concluded that there was a bona fide dispute as to whether the fire caused the dissolution of Blair House.  The Bankruptcy Court noted that it "labored" with how to construe the definition of "Sale" in the Partnership Agreement; that there was "merit" in General Holdings' argument that the tax loss exclusion to the definition of "Sale" could include loss by fire; and that the dissolution of the partnership may be subject to government approval under the loan documents. *Hancock*, App. at 386:5, 9.  Taken together, these circumstances led the Bankruptcy Court to conclude that there was a bona fide dispute and thus it dismissed the involuntary petition.

Second, it concluded that, to the extent that Hancock was still pressing the argument that Blair House had been dissolved due to a change in control of General Holdings, there was a bona fide dispute as to whether Hancock consented to the change in control and as to whether Hancock would be estopped from raising the issue

12

because of the position that she took in other litigation, presumably *Olson v. Gleichman*.

The Bankruptcy Court did not decide any of these disputed issues—it merely concluded that the existence of a bona fide dispute precluded Hancock from bringing an involuntary bankruptcy petition and then issued an order dismissing the petition (*Hancock*, App. at 389). Hancock did not appeal this order.

## 2.    Attorney Fees and Punitive Damages

On July 7, 2021, General Holdings moved under Bankruptcy Rule 7054[6] and 11 U.S.C.A. § 303(i) for an award of attorney fees and costs against Hancock (*Hancock*, App. at 393-99). In its motion, General Holdings argued that "unsuccessful [involuntary] petitioners should generally expect that fees and costs will be awarded to the debtor." *Hancock,* App. at 394 (emphasis omitted) (quoting *In re K.P. Enter.*, 135 B.R. 174, 177 (Bankr. D. Me. 1992)). Additionally, General Holdings argued that although bad faith was not necessarily required for an award of attorney fees and costs, Hancock had in fact filed the involuntary petition in bad faith because (1) she had waited until the day that General Holdings' brief was due to abandon her unpaid cash distribution claim; (2) she had known that there was a bona fide dispute as to the unpaid cash distribution claim because there was pending litigation on the issue; (3) she had known that under the Partnership Agreement, Blair House could not dissolve if doing so would violate federal regulations or agreements; and (4) her

---

[6]   This case involves multiple provisions of the Federal Rules of Bankruptcy Procedure and the Federal Rules of Civil Procedure.  For ease of reference, these will be referred to in text as the "Bankruptcy Rules" and the "Civil Rules," respectively.

positions were tortured and frivolous. Blair House also requested an award of punitive damages based on this bad faith.

Hancock filed a combined Objection, Motion to Dismiss, and Motion to Abstain (*Hancock*, App. at 403-23). In her Objection, Hancock argued that the motion for fees and damages should be dismissed because, among other things, (1) General Holdings did not have authority to bind Blair House, (2) General Holdings was not the debtor and could not be awarded fees under section 303(i), and (3) General Holdings is prohibited under the Partnership Agreement from seeking fees against a limited partner of Blair House. She further argued that if the motion was not dismissed, the Bankruptcy Court must abstain[7] from ruling on it under 28 U.S.C.A. § 1334(c)(2) (West 2022) because whether General Holdings was properly a general partner of Blair House was an issue that remained pending and undecided in a receivership action that Hancock had recently filed in state court.[8] Notably, Hancock filed the state court case *after* the Bankruptcy Court issued its order dismissing the involuntary petition.

Next, Hancock, citing *In re K.P. Enterprise*, 135 B.R. at 177, argued that the rule that attorney fees and costs are usually awarded after an involuntary petition is

---

[7] Hancock also argued that the Bankruptcy Court should abstain as a permissive matter because the issues presented in the case were only local issues not of federal concern.

[8] The receivership action is captioned *Ellen M. Hancock as Trustee of the Hillman Mather Adams Norberg Trust v. Blair House Associates Ltd. Partnership*, No. PORSC-CV-21-264. The case was originally filed in the Superior Court (Cumberland County), but it has since been transferred to the Maine Business and Consumer Docket. In her complaint in the receivership action (which Hancock attached to her Objection), Hancock seeks a declaratory judgment as to whether (1) Blair House was dissolved by the 2020 fire, (2) there was an Event of Withdrawal that terminated General Holdings' authority to act as a general partner, and (3) Blair House was dissolved by the alleged withdrawal of General Holdings.

dismissed "is not hard and fast" and that they should not be awarded here because there was no bad faith on her part and that, for the same reason, punitive damages should not be awarded. *Hancock*, App. at 418. Finally, she argued that she was entitled to an evidentiary hearing so that she could discuss her "motivations and objectives" and whether she believed that the involuntary petition was "proper and sustainable." *Hancock*, App. at 419.

On August 17, 2021, the Bankruptcy Court held an administrative hearing on the request for attorney fees and damages (*Hancock*, App. at 508). After hearing argument, the Bankruptcy Court entered the order proposed by General Holdings, overruled Hancock's Objection, and denied her Motion to Dismiss and Abstain. The Bankruptcy Court ordered Hancock to pay attorney fees because of the "standard rule . . . that involuntary proceedings should not be commenced lightly," *Hancock*, App. at 527:21-23, and because Hancock could not have believed that there was no bona fide dispute as to Blair House's liability in light of: the pending *Olson v. Gleichman* case about the status of the partnership, the ambiguous language of the Partnership Agreement, and the existence of the agreement with the Rural Development Office. The Bankruptcy Court further ordered Hancock to pay punitive damages because Hancock had acted in bad faith by filing the involuntary petition "as a greater part of a litigation strategy in a partnership dispute." *Hancock*, App. at 529:14-15. The Bankruptcy Court concluded that Hancock's behavior throughout the case (including withdrawing her unpaid cash distribution claim at the last minute, raising "varying and sometimes disingenuous arguments," *Hancock*, App. at 529:16, and filing the receivership action in state court immediately after the bankruptcy action was not

decided in her favor) provided further support for the conclusion that Hancock had litigated the case in bad faith.   The Bankruptcy Court explained that it was unnecessary to hold an evidentiary hearing:

> While it is true that evidentiary hearings are often conducted in the course of a fee award, they are not always necessary where, as here, the limited record contains ample evidence of a vitriolic partnership battle, resulting in multiple lawsuits . . . including an involuntary petition brought by a limited partner who, in the short time that I've dealt with this, has presented multiple conflicting positions with respect to her arguments.   It is apparent that Ms. Hancock filed this petition in bad faith, and the attempt to use the involuntary process, to me, amounts to an abuse of the bankruptcy law.

*Hancock*, App. at 531:20-532:6.  The Bankruptcy Court asked the parties to confer in an attempt to agree on the amount that Hancock should pay in fees and damages.

The parties were unable to agree on an amount, and General Holdings filed a brief asking for $48,030 in attorney fees and $100,000 in punitive damages, plus another $3,000 in fees to close the case (*Hancock*, App. at 535-45).  Hancock objected on September 29, 2021, again raising the argument that General Holdings had no authority to act for Blair House and that the Partnership Agreement precludes General Holdings from seeking attorney fees (*Hancock*, App. at 586-96).  She further argued that the Bankruptcy Court committed legal error in ordering Hancock to pay attorney fees and punitive damages despite not "taking any evidence, affidavit[,] or any proffer of fact concerning Ms. Hancock's state of mind."  *Hancock*, App. at 590.  She said that she could, at trial, "present evidence in the form of expert testimony confirming that her belief that the involuntary petition was warranted was entirely justified and not motivated by malice."  *Hancock*, App. at 590.  In the same filing, Hancock asserted counterclaims and crossclaims for, among other things, breach of

fiduciary duties and breach of contract against Blair House, General Holdings, and individuals with ownership interests in those entities. She also demanded a jury trial on these claims.

On the same day, Hancock filed a Motion to Withdraw the Reference to the Bankruptcy Court (*Hancock*, App. at 655-66; No. 2:21-mc-00270-JDL, ECF No. 1), reiterating many of the same arguments that she had already made to the Bankruptcy Court. I denied Hancock's request to withdraw the reference in an order dated February 15, 2022 (*Hancock*, App. at 674-80; No. 2:21-mc-00270-JDL, ECF No. 9).

The Bankruptcy Court then entered a "Further Order on Request for Award of Attorney's Fees and Punitive Damages" (the "Further Order") that required Hancock to pay $48,000 in attorney fees and $100,000 in punitive damages (*Hancock*, App. at 609-20). As to attorney fees, the Bankruptcy Court concluded that (1) nothing in the Partnership Agreement specifically precluded the award of attorney fees;[9] (2) General Holdings was entitled to an award of attorney fees under the circumstances; and (3) the amount of fees sought were reasonable. The Bankruptcy Court expressly rejected Hancock's arguments that General Holdings was not properly a general partner and that, even if it was, only debtors and not general partners may recover attorney fees under section 303(i) because these arguments "merely muddy the waters with state law partnership disputes which are not before the [Bankruptcy] Court" and because the Bankruptcy Court "had no difficulty understanding that General Holdings was

---

[9]  The Bankruptcy Court expressly chose not to address the "broader question" of whether a contractual agreement like the Partnership Agreement could ever divest a Bankruptcy Court of its inherent and statutory powers to award fees. *Hancock*, App. at 612.

acting on behalf of the putative debtor." *Hancock*, App. at 612-13 n.3.  In doing so, the Bankruptcy Court noted that "none of the fees, costs[,] or punitive damages being awarded . . . arise from the relative contractual positions of the parties but rather represent sanctions against a party for its abuse of [the] bankruptcy process." *Hancock*, App. at 613 n.3.

As to punitive damages, the Bankruptcy Court concluded that General Holdings was entitled to a punitive damages award because the totality of the circumstances showed that Hancock had litigated in bad faith by, among other things, (1) abandoning at the last minute her unpaid cash distribution claim that was already being litigated in state court; (2) contending that there was no bona fide dispute despite plainly ambiguous language in the Partnership Agreement, ongoing state litigation, and federal loan documents requiring Blair House to rebuild the project; (3) and moving to withdraw the reference to the Bankruptcy Court after the case was practically resolved.  In particular, the Bankruptcy Court noted that Hancock had filed the petition in an attempt to "gain leverage in a partnership dispute and to improperly evade an unfavorable regulatory decision" and that her "actions establish a pattern of forum-shopping in an attempt to evade adverse rulings." *Hancock*, App. at 618, 20.  Additionally, the Bankruptcy Court again rejected the argument that it could not "find bad faith without taking evidence regarding Ms. Hancock's state of mind in commencing this case." *Hancock*, App. at 619.  It reasoned that Hancock's filings "speak for themselves and evidence a blind commitment to scorched earth litigation tactics" and that "[n]o amount of evidence regarding Ms. Hancock's state of mind could have overcome the existence of state court litigation over the unpaid

distributions or the regulatory framework overlaying the Partnership Agreement." *Hancock*, App. at 619.  It also observed that Hancock's litigation tactics themselves were evidence of bad faith.  The Further Order did not address the original request for costs, and it also dismissed without prejudice Hancock's crossclaims and counterclaims.[10]

Hancock then moved for reconsideration of the Further Order (*Hancock*, App. at 621-40).  Hancock alleged that the Bankruptcy Court committed a manifest error of law and fact when it permitted General Holdings to receive an award of attorney fees because General Holdings was not the Debtor and, separately, had no authority to act because it was not properly a general partner and could not act without the approval of the other partners.  Hancock further argued, again, that the Bankruptcy Court could not have awarded punitive damages because it did not hold an evidentiary hearing and, for the first time, Hancock included details as to what she would have testified to at an evidentiary hearing.

In an Order dated March 31, 2022, the Bankruptcy Court denied Hancock's Motion to Reconsider (*Hancock*, App. at 648-651).  In so holding, the Bankruptcy Court noted that it agreed with Hancock "that factual disputes abound with respect to Blair's House's continued viability . . ., the respective rights of [Hancock] and [General Holdings] under the Limited Partnership Agreement and state partnership law, and [Hancock's] entitlement to a liquidation distribution." *Hancock*, App. at 649. The Bankruptcy Court noted, though, that these disputes are precisely what

---

[10]  The Bankruptcy Court did rule in Hancock's favor in one respect, concluding that evidence about Hancock's personal finances was inadmissible and irrelevant because the action was against her in her capacity as Trustee.

supported the finding that Hancock knew that the liquidation distribution claim was subject to a bona fide dispute and had litigated in bad faith. As to Hancock's argument that attorney fees could not be awarded due to the fact that General Holdings was not the "debtor" as required by 11 U.S.C.A. § 303(i), the Bankruptcy Court said that Hancock "cannot expect to use the technicalities of 11 U.S.C. § 303(i) as a shield when [she] so readily and improperly utilized 11 U.S.C. § 303(a) as a sword." *Hancock*, App. at 650. Therefore, the Bankruptcy Court concluded:

> This Court will not be backed into deciding, for the purposes of 11 U.S.C. § 303(i), the very issues that the Trust sought to forum shop to this Court through an improper petition. In the interest of protecting the sanctity of the bankruptcy process, and enforcing the rigid gatekeeping provisions of 11 U.S.C. § 303(b), it is enough for this Court to find that one purported [limited] partner improperly attempted to force Blair House into involuntary bankruptcy, necessitating another purported general partner to successfully defend against the petition on Blair House's behalf.

*Hancock*, App. at 650. Finally, the Bankruptcy Court noted that the motion, which only rehashed old arguments and presented no new ones, underscored the bad-faith nature in which Hancock had litigated the case and the need for punitive damages.

On April 12, 2022, Hancock filed a notice that she was appealing three rulings of the Bankruptcy Court under 28 U.S.C.A. § 158: (1) the first Order on Requesting Attorneys' Fees, (2) the Further Order, and (3) the Order Denying the Motion for Reconsideration (*Hancock*, ECF No. 1; *Hancock*, App. at 652). Ellen Hancock died not long after the appeal was filed, and Mary F. Wolfson, who succeeded her as Trustee of the Hillman Mather Adams Norberg Trust, was substituted as appellant.

### 3.    Writ of Execution and Substitution of Wolfson

After the denial of Hancock's Motion for Reconsideration and the filing of this appeal—but before Hancock's death—Blair House requested that the Bankruptcy Court issue a Writ of Execution in the amount of $148,000 against Hancock.  Hancock objected on the grounds that under Maine law, a writ of execution on a money judgment could not issue until after all appeals have been decided.  After further briefing, the Bankruptcy Court agreed with Blair House and on April 29, 2022, directed the issuance of a Writ of Execution (*Wolfson*, App. at 16-19).  In doing so, the Bankruptcy Court, expressly applied Civil Rules 62 and 69(a) and reasoned that it did not have to look to Maine law because the Civil Rules were directly applicable and did not prevent the issuance of a writ of execution.  The Bankruptcy Court did not address whether Maine law in fact precluded the issuance of a writ of execution.

Around the same time, Hancock died.[11]  Blair House then filed a Motion for Substitution of Party, asking the Bankruptcy Court to issue the Writ of Execution in the name of the Trust's new Trustee, Mary F. Wolfson, who had recently filed a notice of substitution in the pending *Hancock* attorney fees appeal (*Wolfson*, App. at 20). Wolfson objected to the Motion for Substitution for several reasons, including that (1) the Further Order was directed against Hancock as Trustee only, not the Trust itself, and under both the Bankruptcy Code and state law, the award could not be assessed against the Trust; (2) the Bankruptcy Court lacked subject-matter jurisdiction over

---

[11]  Wolfson asserts that Hancock died on April 19, 2022—ten days prior to the issuance of the order directing that a writ of execution issue against her in her capacity as trustee.  However, the Bankruptcy Court was not informed of Hancock's death until after it had ordered that a writ of execution issue against her.

the Motion to Substitute Party because of the pending *Hancock* appeal; and (3) a Writ of Execution should not have been issued at all because of the pending *Hancock* appeal. (*Wolfson*, App. at 26-44). After a hearing, the Bankruptcy Court granted Blair House's Motion for Substitution of Party (*Wolfson*, App. at 59), noting that it disagreed with Wolfson's assessment that the attorney fee awards were not against the Trust.

Wolfson filed a notice that she was appealing the Bankruptcy Court's Order on the Motion to Substitute Party to the extent that it ordered a writ of execution to issue against her (*Wolfson*, App. at 60). Wolfson moved to stay the Further Order and the Order on the Motion to Substitute Party pending the outcome of these appeals, which I denied.

## II.  STANDARD OF REVIEW

On appeal of a Bankruptcy Court decision to the District Court pursuant to 28 U.S.C.A. § 158(a), the District Court reviews the Bankruptcy Court's conclusions of law *de novo* and its factual findings for clear error. *Russell v. Allied Textile Cos., PLC* (*In re Carleton Woolen Mills, Inc.*), 281 B.R. 409, 413 (D. Me. 2002); *see also id.* ("'The bankruptcy court's interpretation of particular statutes is a question of law,' while application of a statute to the facts 'poses a mixed question of law and fact, subject to the clearly erroneous standard, unless the bankruptcy court's analysis was infected by legal error.'" (quoting *United States v. Sterling Consulting Corp.* (*In re Indian Motorcycle Co.*), 261 B.R. 800, 805 (B.A.P. 1st Cir. 2001))).

"A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction

that a mistake has been committed." *Cox v. Villani* (*In re Villani*), 478 B.R. 51, 58 (B.A.P. 1st Cir. 2012) (quoting *Stornawaye Fin. Corp. v. Hill* (*In re Hill*), 387 B.R. 339, 345 (B.A.P. 1st Cir. 2008)).  However, "[i]f the trial court's account of the evidence is plausible, in light of the record viewed in its entirety, a reviewing court may not reverse, even if convinced that if it had been sitting as a trier of fact, it would have weighed the evidence differently." *Id.* (quoting *Hill*, 387 B.R. at 345).  In other words, "[i]f the bankruptcy court's findings are supportable on any reasonable view of the record, [a reviewing court is] bound to uphold them." *Parvizi v. United States* (*In re Parvizi*), 641 B.R. 729, 745 (B.A.P. 1st Cir. 2022) (quoting *Gannett v. Carp* (*In re Carp*), 340 F.3d 15, 22 (1st Cir. 2003)).

Certain decisions of a bankruptcy court, such as the decision to award attorney fees and costs or to hold an evidentiary hearing, are reviewed only for abuse of discretion.  *See Torres Lopez v. Consejo de Titulares del Condominio Carolina Ct. Apts.* (*In re Torres Lopez*), 405 B.R. 24, 30 (B.A.P. 1st Cir. 2009).  "Abuse of discretion occurs when the trial court ignores a material factor deserving significant weight, relies upon an improper factor, or assesses all proper and no improper factors, but makes a serious mistake in weighing them." *Id.*  "[A] material error of law is invariably an abuse of discretion." *United States v. Walker*, 665 F.3d 212, 223 (1st Cir. 2011).

## III. LEGAL ANALYSIS

### A. The *Hancock* Appeal of the Attorney Fees and Punitive Damages Orders

Wolfson raises a number of arguments as to why the Bankruptcy Court erred in awarding attorney fees and punitive damages against her under section 303(i). In this section, I will discuss (1) the relevant statute, section 303, focusing on section 303(i), which sets out the Bankruptcy Court's authority to award attorney fees and punitive damages; (2) whether the Bankruptcy Court erred in awarding attorney fees; and (3) whether the Bankruptcy Court erred in awarding punitive damages.

#### 1. Involuntary Petitions Under Section 303

The involuntary petition against Blair House was initiated under 11 U.S.C.A. § 303(b), which permits the initiation of an involuntary petition by the holder of a claim "that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount" if the value of the claim exceeds $16,750.[12] Such petitions can be contested. Specifically, "[t]he debtor, *or a general partner in a partnership debtor that did not join in the petition*, may file an answer to [an involuntary] petition." 11 U.S.C.A. § 303(d) (emphasis added).

The standard for what constitutes a "bona fide dispute" is an objective one, and "if there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts, then the petition must be dismissed." *Metz v. Dilley* (*In re Dilley*), 339 B.R. 1, 6 (B.A.P. 1st Cir. 2006) (quoting *In re Lough*, 57 B.R. 993, 997 (Bankr. E.D. Mich.

---

[12] On February 4, 2022, the necessary value of the claim was increased to $18,600. 11 U.S.C.A. § 303(b) note (Adjustment of Dollar Amounts).

1986)).  In proceedings on an involuntary petition, although the Bankruptcy Court may address the legal merits of the dispute—and may have to do so in some circumstances—the Bankruptcy Court "is not to *resolve* any genuine issues of fact or law; its inquiry is to determine if such an issue exists."  *Id.*  A debtor's subjective intent is irrelevant as to whether there is a bona fide dispute.  *Id.*

Section 303(i) becomes relevant if the Bankruptcy Court dismisses an involuntary petition not by consent and if "the debtor does not waive the right to [such] judgment."  Under this section, the Bankruptcy Court may, in certain circumstances, order a party that brought an unsuccessful involuntary petition to pay attorney fees and costs, as well as punitive damages.  *See id.*

### (a) Attorney Fees and Costs Under Section 303(i)(1)

Under section 303(i)(1), the Bankruptcy Court may grant judgment "against the petitioners and in favor of the debtor for . . . costs[] or . . . a reasonable attorney's fee."  The decision to make such an award is "committed to the court's discretion."  *In re K.P. Enter.*, 135 B.R. at 177; *see also Banco Popular de P.R. v. Colon* (*In re Colon*), No. PR 07-053, 2008 WL 8664760, at *9 (B.A.P. 1st Cir. Nov. 21, 2008) ("The award of costs and fees is permissive and properly within the discretion of the court.").  Bad faith is not strictly required for an award of fees, but it is a relevant factor for the Bankruptcy Court to consider.  *Colon*, 2008 WL 8664760, at *9.

Although courts use somewhat different standards, "[c]ourts generally hold that the exercise of the court's discretion is based on the totality of the circumstances; that there is a presumption that costs and attorney's fees will be awarded to the alleged debtor following dismissal of an involuntary petition; and that the burden of

proof is on the petitioner to justify a denial of costs and fees." *Id.* (quoting *In re Squillante*, 259 B.R. 548, 553-54 (Bankr. D. Conn. 2001)); *see also* 2 Collier on Bankruptcy ¶ 303.33[3] (16th ed. 2023) ("Given the policy behind section 303(i) and the effort to balance the competing rights of debtors and creditors under section 303 as a whole, the better argument is that the presumption for the award of costs and fees should be in favor of the debtor. Once the debtor demonstrates that the fees and costs are reasonable, the burden shifts to the petitioning creditors to show those factors that overcome the presumption in the debtor's favor." (footnote omitted)).

In *In re K.P. Enterprise*, the Bankruptcy Court observed that because of "fairness" interests and the language of section 303(i), "unsuccessful petitioners should generally expect that fees and costs will be awarded to the debtor" but that this rule is not "hard and fast." 135 B.R. at 177. *In re K.P. Enterprise* further implied that an award of fees and costs will be denied only in "limited circumstances." *See id.* at 177-78 (quoting *In re Anderson*, 95 B.R. 703, 705 (Bankr. W.D. Mo. 1989)). The Bankruptcy Court's exercise of discretion is informed by "such factors as the reasonableness of the petitioners' actions, their motivation and objectives, and the merits of their view that the petition was proper and sustainable." *Id.* at 177.

### (b) Punitive Damages Under Section 303(i)(2)

Under section 303(i)(2), the Bankruptcy Court may grant judgment "against any petitioner that filed the petition in bad faith[] for . . . any damages proximately caused by such filing[] or . . . punitive damages."[13]   Like attorney fees, punitive

---

[13]  Relief for fees and costs under section 303(i)(1) and punitive damages under section 303(i)(2) are not mutually exclusive. *In re K.P. Enter.*, 135 B.R. at 177-78.

damages may be awarded after an unsuccessful involuntary petition due to the serious consequences that can flow from the initiation of involuntary bankruptcy proceedings. *See Vibe Micro, Inc. v. SIG Cap., LLC* (*In re 8Speed8, Inc.*), 921 F.3d 1193, 1196 (9th Cir. 2019) ("Section 303(i) is intended to alleviate the consequences that involuntary proceedings impose on the debtor. Those consequences include 'loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment.'" (quoting *In re Reid*, 773 F.2d 945, 946 (7th Cir. 1985))). But unlike attorney fees, a finding of bad faith is a prerequisite to a punitive damages award. *See In re K.P. Enter.*, 135 B.R. at 179. As discussed in more detail below, there are multiple tests for bad faith that are applied in this context. *See* 2 Collier on Bankruptcy ¶¶ 303.16[1], 303.33[5][a].

If bad faith is found, the bankruptcy court still has discretion not to issue a punitive damages award, but it must "exercise its discretion in a manner that will discourage misuse of the bankruptcy process, without discouraging resort to it in appropriate circumstances." *In re K.P. Enter.*, 135 B.R. at 183.

## 2.    The Award of Attorney Fees and Costs

Wolfson asserts that the Bankruptcy Court erred in ordering Hancock to pay attorney fees, arguing that (a) General Holdings, which is only a putative general partner, is not the debtor, and the Bankruptcy Court did not determine whether General Holdings is in fact a general partner; (b) the Bankruptcy Court did not determine whether General Holdings was acting within the scope of its authority as a general partner; and (c) the Partnership Agreement precluded General Holdings from seeking fees. Although I reject these arguments, for the reasons set forth in

subsection (d), I vacate the award of attorney fees so that the Bankruptcy Court may reconsider its award in light of additional evidence it receives on remand.[14]

### (a) Whether The Bankruptcy Court Erred Because It Awarded Fees to General Holdings, A Putative General Partner

Wolfson first argues that the Bankruptcy Court erred in awarding attorney fees because there was no evidence that the actual debtor, Blair House, incurred any fees. According to Wolfson, that fact is fatal to the attorney fees award because fees can only be awarded in favor of the debtor.

As Wolfson notes, in most circumstances, only the debtor itself may collect attorney fees. Under section 303(i)(1), the Bankruptcy Court may grant judgment "against the petitioners and in favor of the debtor for . . . costs[] or . . . a reasonable attorney's fee." *See also* 2 Collier on Bankruptcy ¶ 303.33 ("An interesting question arises over whether sanctions may be recovered by parties other than the debtor. Because section 303(i) does not, on its face, cover such a situation, most courts restrict recovery to the debtor."). And multiple courts have rejected assertions by non-debtors that they are entitled to fees and damages under section 303(i). *See Vibe Micro, Inc.*, 921 F.3d at 1194-96 (concluding that a fifty percent shareholder of a debtor could not receive damages under section 303(i)); *In re RMAA Real Est. Holdings, LLC*, No. 10-15244-RGM, 2010 WL 5128647, at *6-7 (Bankr. E.D. Va. Dec. 10, 2010) (concluding that a non-debtor bank could not assert a claim for damages under section 303(i)(2)); *In re VII Holdings Co.*, 362 B.R. 663, 667-68 (Bankr. D. Del. 2007) (concluding that

---

[14]  It is unclear whether Wolfson intends the arguments addressed in subsections (a), (b), and (c) to apply to the Bankruptcy Court's punitive damages award. To the extent that she makes this assertion, the arguments are unpersuasive with respect to the punitive damages award for the same reasons discussed here.

non-petitioning creditors could not recover fees under section 303(i)(1) or damages under section 303(i)(2)); *Miles v. Okun* (*In re Miles*), 430 F.3d 1083, 1093-94 (9th Cir. 2005) (rejecting an argument that third party family members be permitted to receive damages under section 303(i)(2)); *Franklin v. Four Media Co.* (*In re Mike Hammer Prods., Inc.*), 294 B.R. 752, 754-55 (B.A.P. 9th Cir. 2003) (concluding that non-petitioning creditors could not recover damages under section 303(i)(2)).

But Wolfson's position is ultimately unpersuasive because it fails to account for the fact that, unlike the non-petitioning creditors, banks, majority shareholders, and family members addressed in the cases mentioned above, general partners are expressly authorized by section 303(d) to defend against an involuntary petition on behalf of a partnership debtor.  To give this provision practical effect, a defending general partner acting on behalf of a partnership debtor must be entitled to the same relief under section 303(i) as the debtor itself because, in those circumstances, a partnership is acting through its general partner.  This construction of sections 303(d) and 303(i) is supported by case law.

In *In re Fox Island Square Partnership*, the Bankruptcy Court for the Northern District of Illinois addressed this precise question and concluded that "for all intents and purposes, [the general partner], as the non-petitioning partner who attempted to save the Partnership from bankruptcy, represented the Partnership and thus may seek an award under Section 303." 106 B.R. 962, 967 (Bankr. N.D. Ill. 1989); *see also Franklin*, 294 B.R. at 755 (citing *Fox Island* with approval); *Vibe Micro, Inc. v. SIG Cap., LLC*, No. 2:14-cv-01618-RFB, 2017 WL 2225569, at *3 (D. Nev. May 22, 2017)

(citing *Fox Island* and noting that "it may make sense to allow a general partner to represent the partnership in bankruptcy and to recover fees"), *aff'd*, 921 F.3d 1193.

Additionally, other courts have rejected a strictly technical reading of section 303(i) and have "allowed a party closely tied to the case, even if not the party named in the involuntary petition, to contest the involuntary proceedings and recover their attorney's fees and costs." *Havens v. Leong P'ship*, 586 B.R. 760, 767 (N.D. Cal. 2018) (affirming a bankruptcy court decision that permitted an alleged general partner of a partnership that may not have actually existed to seek an award under section 303), *aff'd*, 788 Fed. App'x 526 (9th Cir. 2019) (mem.); *see also In re Ed Jansen's Patio, Inc.*, 183 B.R. 643, 644 (Bankr. M.D. Fla. 1995) (concluding that an assignee of a defunct business who was the debtor could get fees and costs under section 303(i) because "in a situation such as the one presently before the Court, there must be available some remedy for the improper filing of an involuntary petition"); *In re Synergistic Techs., Inc.*, No. 07-31733-SGJ-7, 2007 WL 2264700, at *5 (Bankr. N.D. Tex. Aug. 6, 2007) (concluding that a corporate officer of a debtor had the authority to seek damages under section 303(i) when other officers had brought the petition); *In re Westerleigh Dev. Corp.*, 141 B.R. 38, 40 (S.D.N.Y. 1992) (concluding that a fifty percent shareholder of a corporation could defend against an involuntary petition because the debtor was "paralyzed" due to the fact that another fifty percent shareholder had brought the petition).

Finally, several other considerations lead me to conclude that general partners are an exception to the general rule that non-debtors are not entitled to fees under section 303. Bankruptcy Rule 9001(5) provides, "When any act is required by these

rules to be performed by a debtor . . . if the debtor is a partnership, 'debtor' includes any or all of its general partners, or, if designated by the court, any other person in control." Although this Rule cannot supersede the language of section 303(i), it is persuasive authority in support of a conclusion that general partners can be entitled to fees and costs under that statute. *See Havens*, 788 Fed. App'x at 527 (citing Bankruptcy Rule 9001(5) as one of the reasons why a party named as a general partner was able to seek an award of fees under section 303(i)). Further, the policy considerations underlying courts' decisions to refuse to allow non-debtors to receive fees are inapplicable to general partners defending partnerships because partnerships act through their general partners. *See Miles*, 430 F.3d at 1094 (noting the potential for debtors to abuse the process by having the ability to waive another party's damages); *Franklin*, 294 B.R. at 754-55 (same). And in light of the rule that parties cannot collaterally attack involuntary bankruptcy proceedings or seek fees in state court, *see Miles*, 430 F.3d at 1090-91, general partners who successfully oppose an involuntary petition would find themselves without a remedy despite the fact that they are expressly authorized to defend against petitions under section 303(d).

Consequently, I reject the formalistic and cramped reading of section 303(i) urged by Wolfson, which would preclude general partners from being entitled to fees, costs, and damages under the statute. The approach adopted by the *Fox Island* court is the better approach. Thus, the fact that the fees were incurred by General Holdings on Blair House's behalf does not affect the Bankruptcy Court's authority to award

attorney fees and costs.[15]  This case is unlike those relied upon by Wolfson to support her argument that fees cannot be awarded because Blair House itself did not incur the fees.  *See In re Clean Fuel Techs. II, LLC*, 544 B.R. 591, 607 (Bankr. W.D. Tex. 2016) (declining to award attorney fees because they would operate more as a personal reward to an officer of a debtor whose services did not actually cost the debtor); *In re R. V. Seating, Inc.*, 8 B.R. 663, 666 (S.D. Fla. 1981) (declining to award attorney fees when the petition was not filed in bad faith and there was apparently no evidence whatsoever of any costs incurred by the alleged debtor or anyone acting on their behalf).  In this case, General Holdings acted on behalf of Blair House as authorized by statute.  None of the cases relied upon by Wolfson involve such an arrangement.

There is, however, an additional complication that needs to be addressed.  As Wolfson notes, the Bankruptcy Court did not conclusively determine that General Holdings was a general partner of Blair House—instead, the Bankruptcy Court noted that General Holdings was an entity that "maintains that it is Blair House's sole general partner."  *Hancock*, App. at 609.  Wolfson contends that because the Bankruptcy Court recognized that General Holdings' status as a general partner was disputed and did not resolve that dispute, it could not award fees to General Holdings.  She also contends that the Bankruptcy Court should have taken evidence on whether General Holdings was a general partner and whether General Holdings' principal,

---

[15] Wolfson also briefly suggests that the fact that the fee invoices were directed to Rosa Scarcelli, the principal of General Holdings, rather than General Holdings itself, is another reason that the Bankruptcy Court erred in awarding fees.  Besides being undeveloped and thereby waived, *see United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990), I find this contention unpersuasive and do not discuss it further.

Rosa Scarcelli, and General Holdings had their "own motivations" for keeping Blair House out of bankruptcy. *Hancock*, ECF No. 7 at 30.

Given the unique circumstances of this case, the Bankruptcy Court acted within its discretion in concluding that it was sufficient for it to simply determine that General Holdings was acting on behalf of Blair House without finally resolving the disputed question of whether General Holdings was a general partner. The opposite conclusion is entirely at odds with the purpose and structure of section 303(i). When a bankruptcy court reviews an involuntary petition to determine if there is a bona fide dispute, its role "is not to *resolve* any genuine issues of fact or law." *Dilley*, 339 B.R. at 6. Instead, the bankruptcy court is only supposed to "determine if such an issue exists." *Id.* Here, the Bankruptcy Court expressly concluded that there is a bona fide dispute as to whether General Holdings lost its status as a general partner due to an alleged change in control and whether Hancock had consented to that change or was estopped from arguing that General Holdings was not a general partner. Indeed, Wolfson argues that the alleged withdrawal of General Holdings was one of the events that caused the dissolution of Blair House. Forcing the Bankruptcy Court to ultimately decide General Holdings' status would run contrary to the focused scope of the Bankruptcy Court's authority at this stage of an involuntary petition and would, as the Bankruptcy Court itself noted, have "backed [the Bankruptcy Court] into deciding, for the purposes of 11 U.S.C § 303(i),

the very issues the Trust sought to forum shop . . . through an improper petition."[16] *Hancock*, App. at 650.

Moreover, the Bankruptcy Court ensured that the party seeking fees was acting on behalf of the debtor, noting in the Further Order that it "had no difficulty understanding that General Holdings was acting on behalf of the putative debtor." *Hancock*, App. at 612-613 n.3.   And the Bankruptcy Court explained in its Reconsideration Order that "it is enough for this Court to find that one purported [limited] partner improperly attempted to force Blair House into involuntary bankruptcy, necessitating another purported general partner to successfully defend against the petition on Blair House's behalf." *Hancock*, App. at 650.  In essence, the Bankruptcy Court permitted "a party closely tied to the case, even if not the party named in the involuntary petition, to contest the involuntary proceedings and recover their attorney's fees and costs." *Havens*, 586 B.R. at 767; *see also In re Ed Jansen's Patio, Inc.*, 183 B.R. at 644; *In re Synergistic Techs., Inc.*, 2007 WL 2264700, at *5; *In re Westerleigh Dev. Corp.*, 141 B.R. at 40.

*Havens* is particularly instructive: in that case, Havens brought an involuntary petition against the "Leong Partnership" and Leong as a general partner.  586 B.R. at 762, 767 n.11.  Leong denied the existence of the Leong Partnership.  *Id.* at 762. The bankruptcy court concluded that there was a bona fide dispute as to whether the Leong Partnership existed, rejecting an argument that Leong was not authorized to

---

[16] As mentioned above, *supra* n.8, after the involuntary petition was dismissed, Hancock filed a receivership action in state court seeking a judicial declaration of, among other things, whether General Holdings was still a general partner of Blair House.  Although the pendency of this case did not, as Hancock argued, require the Bankruptcy Court to abstain from deciding General Holdings' fees and costs petition, the fact that the issue was being litigated in state court supports the Bankruptcy Court's decision not to decide the partnership issue.

defend against the petition because he had denied that the partnership existed and, therefore, could not hold himself out as a general partner. *Id.* at 762-63. Leong then moved for an award of attorney fees and costs, to which Havens objected on the ground that Leong was not the debtor. *Id.* at 763. The bankruptcy court acknowledged that "serious questions of fact exist regarding the very existence of the Leong Partnership[,]" and it decided to treat Leong as the "debtor" for purposes of responding to the involuntary petition and seeking fees. *Id.* at 763-64. The District Court affirmed the bankruptcy court's judgment, observing that although there was little law addressing the issues facing the court, the existing law permitted bankruptcy courts to, in certain circumstances, allow parties closely tied to a case to recover fees and costs even if they were not technically the named debtor. *Id.* at 767. The District Court also observed that "Leong was as close to the named debtor as possible" and was found to be "the party in interest." *Id.* The Ninth Circuit then summarily affirmed the judgment. *Havens*, 788 Fed. App'x. at 527.

Although not precisely the same, the circumstances of *Havens* are similar to those facing the Bankruptcy Court in this case. Here, as in *Havens*, there is a bona fide dispute as to whether a partnership existed and whether the party that successfully defended against the petition and was seeking fees was actually a general partner. And like in *Havens*, the Bankruptcy Court acted within its discretion in deciding to permit General Holdings, a party closely tied to the case, to defend the action and subsequently seek fees.

Finally, with respect to Wolfson's argument that the Bankruptcy Court should have held an evidentiary hearing on whether General Holdings was a general

partner, the Bankruptcy Court acted reasonably in concluding that General Holdings was acting on behalf of Blair House and that no additional evidence needed to be taken on that question. Furthermore, with respect to Wolfson's assertion that Hancock was entitled to a hearing so that her legal arguments could be addressed, nothing prevented her from raising those legal arguments to the Bankruptcy Court and, in fact, she did so.

In conclusion, the Bankruptcy Court acted within its discretion in treating General Holdings as the general partner of Blair House and ordering the payment of fees notwithstanding the fact that the fees were incurred by General Holdings and not directly by Blair House.

### (b) Whether The Bankruptcy Court Was Required to Decide if General Holdings Acted with Authority

Wolfson next challenges the Bankruptcy Court's decision not to finally resolve the issue of whether General Holdings properly acted within the scope of its authority in defending against the involuntary petition and seeking an award of fees, costs, and damages under section 303(i). Wolfson asserts that General Holdings does not have any authority to bind Blair House with respect to the fee requests for two reasons. First, pursuant to 31 M.R.S.A. § 1352(2) (West 2022), the approval of all partners— both limited and general—is required for actions not taken in the ordinary course of business, and neither the other putative general partner (Pamela Gleichman)[17] nor the limited partner (Hancock) approved of General Holdings' decision to defend

---

[17] Blair House disputes Gleichman's status as a general partner. Whether Gleichman is actually a general partner of Blair House is ultimately immaterial to my conclusion, so I will not discuss the issue further.

against the involuntary petition or seek fees.  Second, pursuant to the terms of the Partnership Agreement, approval by the other putative general partner, Gleichman, was required to bind Blair House to any action.  Wolfson asserts that the Bankruptcy Court's failure to resolve the material issue of whether General Holdings was acting within the scope of its authority was an abuse of discretion.

Relatedly, Wolfson also argues that because the Bankruptcy Court did not ensure that General Holdings was acting within the proper scope of its authority, it failed to ensure that the fees action was prosecuted in the name of the "real party in interest" as required by Civil Rule 17 and made applicable by Bankruptcy Rules 7017 and 9014.[18]

Wolfson's arguments miss the mark because the structure and language of section 303 make it clear that authorization is not a prerequisite for a general partner to defend against an involuntary petition or to seek fees and damages under section 303(i).  Nor did the Bankruptcy Court fail to ensure that this action was not being prosecuted in the name of the real party in interest as required by Civil Rule 17.  Section 303(d) provides that "[t]he debtor, or a general partner in a partnership debtor that did not join in the petition, may file an answer to [an involuntary] petition."  As described above, to give this provision practical effect, it makes sense that a general partner who succeeds in defending against an involuntary petition should be entitled to seek fees under section 303(i).

---

[18]  For purposes of this argument, I will assume without deciding that Civil Rule 17 applies in involuntary bankruptcy actions as Wolfson contends.

Nothing in the language of section 303 supports Wolfson's argument that only general partners with authority to bind the partnership may take advantage of these procedures.  In fact, such a conclusion is inconsistent with the structure and purpose of the statute.  Section 303(d) clearly contemplates that there will be circumstances in which one general (or limited) partner has joined an involuntary petition and other general partners who did not join the petition step in to defend against the petition. *See In re Seychelles*, 30 B.R. 72, 74 (Bankr. N.D. Tex. 1982); *see also, e.g.*, *In re Fox Island Square P'ship*, 106 B.R. at 965 (involving two general partners opposing an involuntary petition filed by a number of other general partners).   In these circumstances, the ability to answer, controvert an involuntary petition, and seek fees provides important protections to general partners who do not support the involuntary petition.  As the bankruptcy court in *In re Seychelles*, explained:

> [A] petition in bankruptcy filed by less than all the general partners of a partnership should be an involuntary petition.  This prevents fewer than all the general partners of a partnership from placing the partnership in a Chapter 7 or 11 without notice and an opportunity to be heard being given to the non-consenting general partners. . . . [In involuntary cases], the non-joining general partners are provided the specific remedy of answering and controverting the filing of the involuntary petition.

30 B.R. at 74 (citations omitted); *see also In re Cloverleaf Props.,* 78 B.R. 242, 244 (B.A.P. 9th Cir. 1987) ("A petition filed by less than all the general partners of a partnership is considered an involuntary petition, subject to certain procedural safeguards.  This system prevents fewer than all general partners of a partnership from placing the partnership in a bankruptcy without providing the non-consenting general partners with notice and an opportunity to be heard." (citations omitted)).

Wolfson's contention that bankruptcy courts must affirmatively ensure that general partners who take advantage of section 303(d) are duly authorized to bind the partnership is inconsistent with this framework.  In Wolfson's view, before a general partner can step in and defend against a petition or seek fees for successfully doing so, they must get the consent of the other partners—who, in the circumstance contemplated by section 303(d)—might very well have been the party who filed the involuntary petition.  Such an illogical scheme would frustrate the purposes of sections 303(d) and 303(i).  Notably, even outside the context of general partnerships, courts have reached similar conclusions.  *See In re Westerleigh Dev. Corp.*, 141 B.R. at 40 (concluding that when there was a corporate governance deadlock preventing the debtor from answering an involuntary petition, a shareholder had standing to contest the petition); *In re Synergistic Techs., Inc.*, 2007 WL 2264700, at *5 ("[W]hen there is a corporate governance deadlock that prevents a corporate debtor from taking a position with regard to an involuntary bankruptcy petition, the court should allow shareholders to assert positions on behalf of the alleged debtor.").

I conclude, therefore, that it was unnecessary for the Bankruptcy Court to resolve whether General Holdings was acting within the scope of its authority prior to awarding attorney fees.

### (c) Whether The Bankruptcy Court Erred Because The Partnership Agreement Precluded General Holdings From Seeking Fees

Wolfson next argues that under the provisions of the Partnership Agreement, no award of fees, costs, or damages could issue against her even if General Holdings was a general partner acting within the scope of its authority.  Wolfson contends that

two specific provisions of the Partnership Agreement proscribe General Holdings from seeking fees from her and that the Bankruptcy Court erred by failing to consider these "controlling provisions." *Hancock*, ECF No. 7 at 27. First, she points to Section 6.8, which states that general partners may receive partnership management fees and development fees but that they cannot "receive any salary, compensation or other fees" from other sources. *Hancock*, App. at 113. Second, she points to Section 7.1 of the Partnership Agreement, which states that "[n]o Limited Partner shall be subject to assessment nor shall any Limited Partner be personally liable for, or bound by, any expenses, liabilities or obligations of the Partnership beyond such Limited Partner's Capital Contribution." *Hancock*, App. at 119.

Wolfson's argument is unpersuasive. She does not point to any authority for her assumption that the terms of the Partnership Agreement preempt General Holdings' ability to seek fees under section 303(i) or the Bankruptcy Court's statutory authority to award fees.

Nor could these provisions be characterized as a waiver of General Holdings' right to seek attorney fees and punitive damages. "[W]aiver is the intentional relinquishment or abandonment of a known right." *Mission Prod. Holdings v. Schleicher & Stebbins Hotels, L.L.C.* (*In re Old Cold, LLC*), 602 B.R. 798, 827 (B.A.P. 1st Cir. 2019) (alteration in original) (quoting *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004)). "To establish waiver, [a party] must show either explicit language indicating the [opposing party's] intent to forego a known right, or conduct from which it may be inferred that the [party] abandoned this right." *Id.* (quoting *Gianola v.*

*Cont'l Cas. Co.*, 817 A.2d 306, 307 (N.H. 2003)).  As I will explain, this standard is not met here.

Wolfson has not pointed to any "conduct from which it may be inferred" that General Holdings has abandoned its right to seek attorney fees and punitive damages.  *Id.*  And nothing in the "explicit language" of the Partnership Agreement shows General Holdings' intent to forego its right to seek attorney fees and punitive damages.  *Id.*  Rather, the provisions relied upon by Wolfson do not even clearly relate to this right and the broad reading of these provisions urged by Wolfson is untenable. Section 6.8 primarily addresses fees paid from the partnership to a general partner for services rendered; it does not plainly disallow a general partner from recouping litigation costs incurred on behalf of the partnership.  And Section 7.1 only provides protection for limited partners from assessment or liabilities and expenses of the partnership.  Here, however, General Holdings did not seek fees from Hancock in her role as a limited partner—instead, it sought fees from Hancock in her role as the party who filed the involuntary petition.  Thus, Section 7.1 does not proscribe General Holdings' conduct.

This case, then, is not one in which General Holdings "intentional[ly] relinquish[ed] or abandon[ed] . . . a known right."  Thus, waiver is inapplicable.  *Id.*; *see also Mitchell v. Weinmann* (*In re Mitchell*), No. CO-11-086, 2012 WL 5995443, at *10 (B.A.P. 10th Cir. Dec. 3, 2012) (concluding that a party had waived its rights to relief under section 303(i) after signing a settlement agreement expressly saying so).

### (d)  Conclusion as to Attorney Fees

Finally, to the extent that Wolfson challenges the Bankruptcy Court's exercise of discretion in awarding attorney fees, I reject that challenge.  "The award of costs and fees is permissive and properly within the discretion of the court."  *Colon*, 2008 WL 8664760, at *9.  And there is a presumption that a party who successfully defends against an involuntary petition will be awarded fees.  *Id.* (citing *In re Squillante*, 259 B.R. at 553-54).  The petitioner bears the burden of justifying the denial of a request for fees and costs under section 303(i).  *Id.*  Here, on the record before me, I conclude that the Bankruptcy Court acted well within the bounds of discretion in ordering Hancock to pay fees.

Nevertheless, the award of attorney fees must be vacated because, as described below, this Order results in a remand of the case to the Bankruptcy Court to take evidence on Hancock's subjective intent before it determines the bad faith issue and decides whether to award punitive damages.  Although a finding of bad faith is not required for an award of attorney fees under section 303(i)(1), *id.*, a petitioner's subjective intent, as well as the existence of bad faith, may be relevant to the Bankruptcy Court's decision to award attorney fees.  *See In re K.P. Enter.*, 136 B.R. at 177 ("Each request for an award of fees and costs invokes the court's discretion, informed by such factors as the reasonableness of the petitioners' actions, their motivation and objectives, and the merits of their view that the petition was proper and sustainable." (citing *In re Reid*, 854 F.2d at 160)).  It is possible that the evidence that the Bankruptcy Court receives on remand regarding Hancock's subjective intent will affect the propriety of the attorney fees award.  Therefore, because I vacate and

remand the punitive damages award, I also vacate the award of attorney fees so that the Bankruptcy Court can reconsider its award in light of the additional evidence it receives in this case, as well as the additional attorney fees that may be incurred in connection with the proceedings on remand.

### 3.  Punitive Damages Award

Wolfson also challenges the Bankruptcy Court's award of punitive damages. Specifically, she argues that the Bankruptcy Court abused its discretion by making a finding of bad faith without taking evidence on Hancock's subjective intent.  Blair House's appellee brief makes only passing reference to this argument.  For the reasons explained below, I agree with Wolfson.[19]

### (a)  The Bankruptcy Court's Decisions

As Wolfson contends, the Bankruptcy Court determined that Hancock had filed the involuntary petition in bad faith and awarded punitive damages without having received any evidence as to Hancock's subjective intent, apart from Hancock's earlier court filings.  Specifically, the Bankruptcy Court based its finding of bad faith on three primary factors.  First, the Bankruptcy Court determined that Hancock could not reasonably have believed that there was no bona fide dispute as to her claims due to the ongoing and, therefore, unresolved state litigation in *Olson v. Gleichman* with respect to unpaid cash distributions, the fact that the liquidation distributions at

---

[19] Because I conclude that the Bankruptcy Court's decision as to punitive damages must be vacated, I decline to consider Wolfson's additional arguments that (1) a finding of bad faith was not justified under the circumstances of this case; and (2) the Bankruptcy Court failed to narrowly tailor its punitive damages award.  Additionally, to the extent that Wolfson has suggested that the failure to permit her to introduce evidence of subjective intent violated due process of law, I do not reach this issue because Hancock waived the same by not developing it in her appellate brief.  *See Zannino*, 895 F.2d at 17.

issue were based on patently ambiguous language in the Partnership Agreement, and the fact that Blair House was bound by loan agreements with the Rural Development Office.  Second, the Bankruptcy Court determined that the timing of this action—Hancock filed this involuntary action slightly more than a month after Blair House was notified by the Rural Development Office that it would have to rebuild the project—was suspicious, which supported a conclusion that Hancock was using an involuntary petition for an improper purpose.  Third, the Bankruptcy Court determined that Hancock's litigation conduct, including waiving the unpaid cash distribution claim at the last minute and moving to abstain and revoke the reference to the Bankruptcy Court after receiving unfavorable decisions from the Bankruptcy Court, also indicated that Hancock had litigated the case in bad faith.  The Bankruptcy Court did not, however, consider or take evidence of Hancock's subjective intent independent of what it could discern from her filings and litigation decisions.

Under the totality of the circumstances of this case, I conclude that Wolfson is correct that the failure to receive evidence regarding subjective intent was an abuse of discretion.  In her Motion to Dismiss and Abstain, Hancock requested an evidentiary hearing so that she could adduce evidence of her subjective intent in relation to the request for fees and punitive damages.  Hancock asserted that "the Court has virtually no admissible evidence regarding, *inter alia*, the Trust's 'motivations and objectives,' nor any information about why the Trust believed that filing the Involuntary Petition 'was proper and sustainable.'"  *Hancock*, App. at 419 (citing *In re K.P. Enter.*, 135 B.R. at 177).  At the August 17, 2021, hearing on the request for attorney fees and punitive damages, the Bankruptcy Court concluded that

an evidentiary hearing was not necessary because Hancock's bad faith could be readily determined based on Hancock's court filings, which showed that the dispute between the parties was a "vitriolic partnership battle" that had led to an improper involuntary petition. *Hancock*, App. at 531:24.

Hancock further developed her request for an evidentiary hearing in her Objection to General Holdings' subsequent Memorandum Seeking Award of Attorneys' Fees and Punitive Damages, which was filed after the Bankruptcy Court's initial determination of bad faith and decision to award punitive damages, but before it decided the amount of damages to be awarded.  Hancock asserted that the Bankruptcy Court erroneously awarded punitive damages "without taking any evidence, affidavit[,] or proffer of fact concerning Ms. Hancock's state of mind." *Hancock*, App. at 590.  She further stated, "when and if this matter goes to trial, Ms. Hancock, as Trustee, will present evidence in the form of expert testimony confirming that her belief that the involuntary petition was warranted[,] was entirely justified and not motivated by malice." *Hancock*, App. at 590.  The Bankruptcy Court rejected this argument in the Further Order, noting Hancock's filings "speak for themselves and evidence a blind commitment to scorched earth litigation tactics[,]" and that "[n]o amount of evidence regarding Ms. Hancock's state of mind could have overcome the existence of state court litigation over the unpaid distributions or the regulatory framework overlaying the Partnership Agreement." *Hancock*, App. at 619.

Hancock repeated her argument in support of an evidentiary hearing in her subsequent Motion to Reconsider.  The motion again argued that Hancock was entitled to an evidentiary hearing to adduce evidence of her subjective intent and

provide a more fulsome explanation of her position.  Hancock also provided more detail about what she or other witnesses would testify to at such a hearing.[20]

After considering Hancock's motion, the Bankruptcy Court denied the Motion for Reconsideration, noting that Hancock largely repeated the same arguments she had previously made.

### (b)  The Standard for Bad Faith

Title 11 U.S.C.A. § 303(i)(2) authorizes the Bankruptcy Court, after the dismissal of an involuntary petition, to grant judgment "against any petitioner that filed the petition in bad faith" for "any damages proximately caused by such filing" or for "punitive damages."  As described above, a finding that a party filed an involuntary bankruptcy petition in bad faith is a prerequisite to an award of punitive damages under section 303(i)(2).  *Colon*, 2008 WL 8664760, at *9 n.8.

The Bankruptcy Code does not define "bad faith," and, as a result, "courts have applied a dizzying array of standards, mostly with regard to post-dismissal motions for damages under § 303(i)(2)."  *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015); *see also* 2 Collier on Bankruptcy ¶ 303.16[1] (discussing the many standards for bad faith).  Two of these standards are particularly germane to this case.

---

[20] Among other things, Hancock asserted that she would present evidence establishing: that there was long-standing animosity between General Holdings' principal, Rosa Scarcelli, and Pamela Gleichman, the other putative general partner of Blair House; her basis for believing that there was no bona fide dispute regarding the specific issues relevant to commencing the involuntary petition; that any disputes were not bona fide and were instead motivated by bad faith on the part of Scarcelli and General Holdings; and that Hancock's primary motivation in filing the involuntary petition was to preserve the remaining assets of Blair House, of which Hancock owned 99%.

The first is the combined objective and subjective test, also known as the Rule 9011 test.[21]  2 Collier on Bankruptcy ¶ 303.16[1].  This is the test that was used in *In re K.P. Enterprise.*  135 B.R. at 180.  Under this "broad, inclusive test," 2 Collier on Bankruptcy ¶ 303.16[1], the bankruptcy court should consider both "[o]bjective and subjective factors," *In re K.P. Enter.*, 135 B.R. at 180; *see also In re Fox Island Square P'ship*, 106 B.R. at 968.  These factors include:

> [W]hether [the petitioner] made reasonable inquiry of relevant facts and pertinent law before initiating th[e] involuntary bankruptcy case; whether the involuntary petition's allegations were well grounded in fact; whether the request for involuntary bankruptcy relief was warranted by existing law or by a good faith argument for extension, modification[,] or reversal of existing law; and whether the action was initiated for any improper purpose, such as harassment, delay or to increase costs.

*In re K.P. Enter.*, 135 B.R. at 180; *see also* 2 Collier on Bankruptcy ¶ 303.16[1].

Other courts apply a totality-of-the-circumstances standard for finding bad faith.  *See, e.g., Betteroads Asphalt, LLC v. Firstbank P.R.*, No. 19-2019 (DRD), 2020 WL 8250016, at *3-4 (D.P.R. Nov. 30, 2020).  This standard also "looks to both subjective and objective evidence of bad faith."  *In re Forever Green Athletic Fields, Inc.*, 804 F.3d at 336 (citing *Adell v. John Richards Homes Bldg. Co.* (*In re John Richards Homes Bldg. Co.*), 439 F.3d 248, 255 n.2 (6th Cir. 2006)).  Under this standard, courts consider a nonexhaustive list of factors, including whether:

> the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable

---

[21] Bankruptcy Rule 9011(b) provides that by presenting a document to the Bankruptcy Court, the filer certifies that to the best of their knowledge and upon reasonable belief (1) the document is not being presented for an improper purpose; (2) the claims within are warranted by law or a good faith argument as to changing the law; (3) the allegations contained within have evidentiary support or are likely to have evidentiary support; and (4) the denial of factual contentions are warranted on the evidence.  This rule "serves as a reference to assist in effectively implementing" section 303(i)(2), but it "neither restricts nor expands the statutory remedy."  *In re K.P. Enter.*, 135 B.R. at 180.

> inquiry into the relevant facts and pertinent law before filing; there was
> evidence of preferential payments to certain creditors or of dissipation
> of the debtor's assets; the filing was motivated by ill will or a desire to
> harass; the petitioning creditors used the filing to obtain a
> disproportionate advantage for themselves rather than to protect
> against other creditors doing the same; the filing was used as a tactical
> advantage in pending actions; the filing was used as a substitute for
> customary debt-collection procedures; and the filing had suspicious
> timing.

*Id.* For both tests, it is important to remember that they "are meant to be guides only. A bankruptcy court need not mechanically tick off each factor and tally up its tick-marks at the end." *Betteroads Asphalt, LLC*, 2020 WL 8250016, at *4 (alteration in original) (quoting *Janvey v. Romero*, 883 F.3d 406, 412 (4th Cir. 2018)).

During the August 17, 2021, hearing on General Holdings' motion for fees and punitive damages, the Bankruptcy Court noted, "Fees and costs in this matter, I think, are clearly appropriate under the standard set forth by Judge Haines in the *K.P. Enterprise* case." *Hancock*, App. at 528:13-15. The Bankruptcy Court went on to say, "Punitive damages are likewise appropriate." *Hancock*, App. at 529:8. This would seem to imply that the Bankruptcy Court applied the combined objective and subjective standard used in *In re K.P. Enterprise*, 135 B.R. at 180. Similarly, in the Further Order, the Bankruptcy Court noted that it had previously granted the request for fees and punitive damages and, "[i]n doing so, the Court applied the standards set forth in *In re K.P. Enterprise*, 135 B.R. 174, 177 (Bankr. D. Me. 1992) and held that Ms. Hancock's commencement of this involuntary bankruptcy proceeding against Blair House was in bad faith and that an award of fees and punitive damages was appropriate." *Hancock*, App. at 609-10. However, elsewhere in the Further Order, the Bankruptcy Court noted that courts determining bad faith

examine the "totality of the circumstances" as provided by *In re Forever Green Athletic Fields, Inc.*, 804 F.3d at 336. *Hancock*, App. at 615.

I need not decide which of the two tests the Bankruptcy Court used to determine bad faith or whether there is any reason for a court not to consider both. Although these tests are subtly different, there is clearly overlap between them. *See* 2 Collier on Bankruptcy ¶ 303.16[1]. One of the overlapping areas of importance is the relevance of a party's subjective intent. Factors in both bad faith standards, including whether "the filing was motivated by ill will or a desire to harass," *In re Forever Green Athletic Fields, Inc.,* 804 F.3d at 336, and whether "the action was initiated for any improper purpose, such as harassment, delay or to increase costs," *In re K.P. Enter.*, 135 B.R. at 180, depend on a party's subjective intent.

### (c) The Bankruptcy Court's Decision Not to Take Evidence on Hancock's Subjective Intent

An evidentiary hearing can help to shed light on the subjective and objective factors in the bad faith analysis. Such hearings are ordinarily held before bankruptcy courts find bad faith and award punitive damages under section 303(i)—a fact that the Bankruptcy Court itself acknowledged in this case. Among other things, evidentiary hearings can provide a record on which a bankruptcy court can determine a petitioner's subjective intent. *See, e.g., In re Meltzer*, 516 B.R. 504, 517-18 (Bankr. N.D. Ill. 2014) (noting that a petitioner provided no evidence at a hearing that he had a proper purpose in filing an involuntary bankruptcy petition); *In re Forever Green Athletic Fields, Inc.*, 500 B.R. 413, 418, 427-28 (Bankr. E.D. Pa. 2013) (noting that a petitioner admitted in his testimony that he filed an involuntary bankruptcy action

to force a party to pay an existing consent judgment), *aff'd*, 804 F.3d 328; *In re Anmuth Holdings, LLC*, 600 B.R. 168, 193 (Bankr. E.D.N.Y. 2019) (concluding that testimony at an evidentiary hearing supported the finding that an involuntary petition was filed for improper purposes); *In re K.P. Enter.*, 135 B.R. at 181 (analyzing a party's testimony at an evidentiary hearing to determine whether the petition was filed for an improper purpose); *In re Val W. Poterek & Sons, Inc.*, 169 B.R. 896, 904, 908 (Bankr. N.D. Ill. 1994) (concluding that there was bad faith after an evidentiary hearing because it was clear that the petitioner knew he was not actually owed the debt at issue).  Notably, evidentiary hearings are often scheduled even when there is arguably very strong objective evidence of bad faith.  *See, e.g.*, *In re Meltzer*, 516 B.R. at 506, 509, 515-18 (holding an evidentiary hearing despite the existence of strong objective indicia of bad faith, including that: the involuntary petition was filed only days before a related eviction proceeding, one of the petitioner's claims was based on an unresolved civil action, the petitioners failed to prosecute their case after filing it, and many of the claims were "flagrantly" fraudulent or "bogus"); *In re John Richards Homes Bldg. Co.*, 439 F.3d at 253, 257 (affirming a decision of the bankruptcy court in which the bankruptcy court held an evidentiary hearing despite the existence of strong objective indicia of bad faith, including that: one of the claims was based on an unresolved civil action that was being actively litigated and the petition was filed less than a week after the putative debtor filed its responsive pleadings in the civil action); *see also In re Val W. Poterek & Sons, Inc.*, 169 B.R. at 904-06 (finding, after an evidentiary hearing, that a petitioner did not bring its claims in bad faith even though

the petitioner, through its counsel, arguably became aware of the fact that it no longer had an outstanding debt against the putative debtor).

In this case, however, the Bankruptcy Court determined that it was not necessary to permit Hancock to introduce any evidence as to her subjective intent because Hancock's written submissions "speak for themselves." *Hancock*, App. at 619. Hancock's submissions unquestionably constitute probative evidence for determining whether Hancock had acted in bad faith. But in declining to receive any additional evidence on the subject, the Court prevented Hancock from offering evidence that could more fully explain whether, as she claimed, "[s]he believed, in good faith, that the Debtor was legally required to be dissolved, and its assets liquidated and distributed, and that GHI and its principal, Ms. Scarcelli, refused to do so in breach of its and her fiduciary [duties] to the Trust." *Hancock*, App. at 634. It is possible, no doubt, that Hancock's evidence might have simply buttressed what the Bankruptcy Court already determined from Hancock's written submissions: that the initiation and prosecution of the involuntary petition in this case "evidence[d] a blind commitment to scorched earth litigation tactics[,]" *Hancock*, App. at 619, and "evidence[d] a commitment to obtain a favorable ruling no matter the cost and no matter the forum," *Hancock*, App. at 620. But it is also possible that additional or different findings might flow from the evidence, whether favorable or unfavorable to Hancock, and that the evidence might also shed light on the total amount of punitive damages that should be awarded.

In light of the circumstances of this case, the Bankruptcy Court's decision to limit the record to Hancock's court filings and to not consider any additional evidence

bearing on her subjective intent in submitting those filings exceeded the bounds of the Bankruptcy Court's discretion. *See Torres Lopez*, 405 B.R. at 30 ("Abuse of discretion occurs when the trial court ignores a material factor deserving significant weight . . . ."); *see also Medpoint Mgmt., Inc. v. Jensen* (*In re Medpoint Mgmt., LLC*), No. AZ-15-1130-KuJaJu, 2016 WL 3251581, at *8 (B.A.P. 9th Cir. June 3, 2016) (noting that a bankruptcy court erred when it decided issues of punitive damages and attorneys fees without permitting the parties to meaningfully address those issues because although a "bankruptcy court enjoys considerable discretion in deciding whether to hold an evidentiary hearing," parties must "be given *some* opportunity to present evidence on material disputed factual issues"); *U.S. Fid. & Guar. Co. v. DJF Realty & Suppliers, Inc.*, 58 B.R. 1008, 1012-13 (N.D.N.Y. 1986) (concluding that the bankruptcy court erred in finding bad faith when it did not consider the petitioner's subjective intent and relied only on evidence of objective intent); *Basin Elec. Power Coop. v. Midwest Processing Co.*, 47 B.R. 903, 909 (D.N.D. 1984) (concluding that the Bankruptcy Court erred in declining to find bad faith when it did not consider the petitioning creditor's subjective motivations), *aff'd*, 769 F.2d 483 (8th Cir. 1985).

That is not to say that a bankruptcy court must always hold an evidentiary hearing prior to finding bad faith or awarding punitive damages under section 303(i)(2). *See Medpoint Mgmt., Inc.*, 2016 WL 3251851, at *8 ("Bad faith is a 'highly factual determination,' but does not generally require an evidentiary hearing." (quoting *Tyner v. Nicholson* (*In re Nicholson*), 435 B.R. 622, 637 (B.A.P. 9th Cir. 2010), *abrogated in part on other grounds by Law v. Siegel*, 571 U.S. 415, 424-27 (2014))). For example, in *In re Silverman*, 230 B.R. 46, 52 (Bankr. D.N.J. 1998), the bankruptcy

court made a finding of bad faith seemingly without holding an evidentiary hearing. However, the circumstances of that case are different than those presented here in two critical respects.  First, there is no indication in *Silverman* that the creditor ever requested an evidentiary hearing on his subjective intent.  Second, the objective evidence of bad faith before the bankruptcy court in *Silverman* established bad faith *per se* because there was a court order issued in a related state proceeding prior to the filing of the involuntary petition which conclusively established the existence of a bona fide dispute.[22]

Here, as in *Silverman*, Hancock's written submissions in support of her petition evidenced her subjective intent.  But unlike *Silverman*, the ongoing state litigation in this case had not produced a court order which conclusively demonstrated that there was a bona fide dispute at the time the involuntary petition was filed.  Further, in *Silverman*, the bankruptcy court concluded that the creditor's bad faith was exacerbated because he had "blatantly" lied when he denied that he had sought summary judgment in state court.  *Id.* at 52-53.  And, as already noted, there is no indication in *Silverman* that the offending party sought to introduce additional evidence bearing on his subjective intent, as Hancock repeatedly did here. *See Cabral v. Shamban* (*In re Cabral*), 285 B.R. 563, 577 (B.A.P. 1st Cir. 2002) ("In the present case, although the Trustee did not submit any affidavits to support his

---

[22]  In *Silverman,* prior to bringing the involuntary bankruptcy action, the creditor sued the debtor, Silverman, in the New Jersey Superior Court on an allegedly unpaid promissory note.  *In re Silverman*, 230 B.R. at 48.  The creditor moved for summary judgment, which was denied because there were genuine disputes of material fact.  *Id.* at 48, 52.  Despite this, the creditor brought the involuntary petition two weeks later.  *Id.* at 52.  The bankruptcy court concluded that the filing of such a petition two weeks after a court ruling that there was a genuine dispute of material fact, thus establishing that there was a bona fide dispute, was "per se sufficient to prove that the creditor acted in bad faith."  *Id.*

allegations, it is clear from a review of the record that the Debtor failed to raise any disputed facts, and, even more importantly, failed to request an evidentiary hearing."); *Prebor v. Collins* (*In re I Don't Trust*), 143 F.3d 1, 4 (1st Cir. 1998) ("That the hearing did not involve live testimony is beside any relevant point, for Prebor never specifically requested that the bankruptcy court hold an *evidentiary* hearing.").

For these reasons, I conclude that it was an abuse of discretion not to receive evidence on or consider a material factor—Hancock's subjective intent—in response to Hancock's requests to present evidence.  Accordingly, the finding of bad faith and the award of punitive damages in this case are vacated and the case is remanded for further proceedings so that the Bankruptcy Court can receive additional evidence on the petitioner's subjective intent.[23]  Further, as noted above, the Bankruptcy Court's award of attorney fees is vacated and remanded so that the Bankruptcy Court can reconsider its award based on the additional evidence it receives.

## B.   The *Wolfson* Appeal

Wolfson also appeals the Bankruptcy Court's Order Substituting Party "insofar as it directs the Clerk of the Bankruptcy Court to issue a writ of execution." *Wolfson*, ECF No. 1 at 1.  As I will explain, in light of my decision to vacate the Bankruptcy Court's awards of attorney fees and punitive damages, Wolfson's appeal related to the previously issued writs of execution is moot.

---

[23]  Taking such evidence in this case may be admittedly difficult in light of Ellen Hancock's death. Hancock, however, was bringing this case in her capacity as Trustee of the Hillman Mather Adams Norberg Trust.  Her successor Trustee, Wolfson, who has litigated the *Hancock* appeal, may be able to shed light on the motivations and objectives behind bringing the involuntary petition.

In the Further Order, the Bankruptcy Court ordered Hancock to pay $48,000 in attorney fees under section 303(i)(1)(B) and $100,000 in punitive damages under section 303(i)(2)(B).  Blair House requested that the Court issue a writ of execution in that amount.  Hancock objected, arguing, among other things, that under Maine law, the Bankruptcy Court could not issue a writ of execution while an appeal was pending.  Rejecting this argument, the Bankruptcy Court ordered the writ to issue on April 29, 2022.  No appeal of this order was taken.

Shortly after Hancock's death, Blair House moved to substitute Wolfson, who succeeded Hancock as Trustee, and to have the writ of execution for $148,000 issued in Wolfson's name.  Wolfson objected, arguing both that she could not be substituted and, as Hancock argued earlier, a writ of execution could not issue while the *Hancock* appeal was pending.  On June 22, 2022, the Bankruptcy Court (1) substituted Wolfson and (2) ordered that a writ of execution issue against her.  Wolfson has appealed this order.  Her appellant brief does not make any arguments that the substitution itself is improper—instead, she argues only that a writ of execution could not issue while the appeal was pending.

Because I vacate and remand the Bankruptcy Court's awards of attorney fees and punitive damages, the writs of execution at issue in this case are no longer enforceable.  Whether or not the writs could be issued is the only issue presented by the *Wolfson* appeal.  Thus, there is no live dispute because resolution of this appeal, in favor of either party, would have no concrete effect given that the orders on which the writs of execution were based have been vacated.  "'[A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest

in the outcome.'" *Pietrangelo v. Sununu*, 15 F.4th 103, 105 (1st Cir. 2021) (alteration in original) (quoting *ACLU of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 52 (1st Cir. 2013)); *see Matt v. HSBC Bank USA, N.A.*, 783 F.3d 368, 372 (1st Cir. 2015) ("[I]f a court may not provide 'any "effectual relief" to the potentially prevailing party,' the case is moot." (quoting *Horizon Bank & Tr. v. Massachusetts*, 391 F.3d 48, 53 (1st Cir. 2004))); *see also Overseas Mil. Sales Corp.  v. Giralt-Armada*, 503 F.3d 12, 17 (1st Cir. 2007) (dismissing an appeal as moot when the issues presented were "no longer live"); *ConnectU LLC v. Zuckerberg*, 522 F.3d 82, 88 (1st Cir. 2008) ("An appeal becomes moot if an intervening event strips the parties of any legally cognizable interest in the outcome.").

Accordingly, the appeal relative to the writs of execution is moot, and I dismiss the appeal without reaching the merits of the parties' arguments.[24]  *See ConnectU LLC*, 522 F.3d at 88 ("[D]ismissal of an appeal is compulsory once a court finds that the parties no longer possess a personal stake in the outcome."); *see also Matt*, 783 F.3d at 372 (noting that mootness can be raised by the court on its own initiative even when the issue is not raised by the parties).

## IV.    CONCLUSION

For the reasons stated above, with respect to the *Hancock* appeal (Civil No. 2:22-cv-00099), the Bankruptcy Court's award of attorney fees and its award of punitive damages are **VACATED AND REMANDED**.  With respect to the *Wolfson* appeal (Civil No. 2:22-cv-00194), the appeal is **DISMISSED AS MOOT**.

---

[24]  Because I dismiss the appeal as moot, I do not address Blair House's specific argument that the appeal was untimely because there was no appeal from the April 29, 2022, Order granting its initial request for a writ of execution.

**SO ORDERED.**

**Dated:  March 31, 2023**

                                      **/s/ JON D. LEVY**
                                **CHIEF U.S. DISTRICT JUDGE**